Michael Mortimer [SBN 164092]
A.T. Kippes [SBN 171688]
THE BUSINESS LITIGATION GROUP LLP
351 California Street, Suite 500
Mail to: Post Office Box 2342
San Francisco, CA 94126-2342

(415) 398-5050; Telecopier: (415) 398-5088; sanfrancisco@att.net; businesslitigationgroup.com

Attorneys for Plaintiff Landis Maez

UNITED STATES DISTRICT COURT

Northern District of California - San Francisco Division

| | |
|---|---|
| Landis Maez,<br><br>        Plaintiff,<br><br>    v.<br><br>ChevronTexaco Corporation; Chevron U.S.A. Inc.; Chevron Energy Solutions, L.P.<br><br>        Defendants. | Case No.: **C-04-00790 JSW (EDL)**<br><br>Declaration – Landis Maez in Support of **OPPOSITION** to Defendants' Motion for Summary Judgment.<br><br>**Honorable Jeffrey S. White**<br>**June 24, 2005, 9:00 a.m.**<br>**Dept. 2, 17th Floor** |

I Landis Maez declare:

1. I am the Plaintiff in the above-entitled action. I make this declaration based on personal knowledge. If called to testify, I could and would testify as to each fact contained in this declaration.

2. I have carefully reviewed Chevron's motion for summary judgment papers and the declarations submitted by Puneet Verma, Mike Moye, Barbara Erickson, Jeffrey Jacobs and John Mahoney. I have noted many statements made in the Defendants papers are inaccurate or mistaken. I have also noted that many statements made by the Declarants are inaccurate or

1  wrong. Lastly, I noted that Defendants' attorney Mike Moye significantly has mischaracterized
2  my deposition testimony

3    3. My declaration will be lengthy. If I had to respond to each inaccuracy or
4  misstatement contained in all the papers submitted by the Defendants and their witnesses, my
5  declaration might total 100 pages or more. Therefore, it is my intent to respond to Defendants'
6  papers via formal objections submitted through my attorneys.

7    4. In late 2000 I interviewed with a number of Chevron management for employment
8  with Chevron Energy Solutions, which I understood to be a division of ChevronTexaco.

9    5. I interviewed for employment in Atlanta, Georgia. I would be a sales manager in
10  Chevron's Power Systems Team headed by Jorge Lopez, the Director of Sales for Chevron [who
11  was later replaced by Puneet Verma in 2002].

12    6. Chevron management informed me that my job would include offering and selling
13  power generation solutions to U. S. customers (both Design-Build <u>and</u> Build to Own and Operate
14  projects or "BOO"). Chevron told me that my pay would include a base salary and substantial
15  bonus compensation based on a percentage of my base salary.

16    7. In a Chevron letter dated December 7, 2000, the Company offered me employment. A
17  true and correct copy of said offer letter is attached herein as Exhibit __1__.

18    8. At the time I was interviewing with Chevron, I had considerable apprehension leaving
19  my current higher base salary Sales Director position with Vericor Power Systems (a Honeywell
20  and Daimler-Chrysler Joint Venture).

21    9. After expressing my concerns to Chevron, Mr. Lopez assured me that he never had a
22  salesman on his team that had NOT achieved at least 40% (of base salary) as the annual bonus
23  compensation. He further stated that the program was set up with 60% of the bonus payment to
24  be based on Company and business unit performance and that only 40% of the compensation
25  based on the Salesman's individual performance. Based on these facts, Mr. Lopez told me it was
26  very difficult not to receive annually full incentive compensation.

27    10. In reliance on verbal assurances from Mr. Lopez about the sales bonus compensation
28  / / /

1  and job security, in January of 2001 I accepted Chevron's offer and began to work for Chevron
2  in Atlanta.

3      11. When I started to work for Chevron, they had me sign a Confidentiality Agreement.
4  In reading Chevron's the Confidentiality Agreement, I noted that it said California law would
5  apply to all disputes related to the Agreement. I did not dispute the provision since Chevron was
6  a major corporation and I did not see any reason to disagree that California law should apply to
7  any disputes.

8      12. I received annual incentive compensation bonuses of approximately 40% of my base
9  salary as compensation under the Short Term Incentive Program (STIP). A true and correct copy
10 of said document is attached herein as Exhibit 2. Ptf 510-512.

11     13. Although I did not meet the Gross Margin measurement criteria for either of the first
12 two years at Chevron, my success with regard to the Company's other 10 objective and
13 subjective personal performance measurements (as measured via the Company's Performance
14 Management Program ('PMP') referred to in the Company's STIP program documents) along
15 with the company and business unit performance percentage, provided me with near 40% (of my
16 base salary) incentive compensation in accordance with my offer letter.

17     14. In 2002, according to the STIP Plan terms and my associated PMP Performance
18 Appraisal for the period, it is clear that that for 2002, my bonus wages did not in any way include
19 compensation for my Sunkist projects. In fact, at no time, until I attempted to obtain 2003
20 bonus payments under the Company's new plan was I ever told that my 2002 compensation
21 included wages for my successful Sunkist projects/sale.

22     15. At the end of 2001, Chevron Energy Solutions moved me and my family to Phoenix,
23 Arizona from Atlanta, Georgia in order for me to focus solely on power generation sales in the
24 State of CA. Mr. Lopez told me that Chevron decided that moving me to CA, and its associated
25 high cost of living, would not be as cost effective for the company as locating me in AZ to call
26 on CA customers. In any event, all of my sales efforts, customers and business endeavors would
27 have to be on the road, in California. A true and correct copy of said document is attached herein
28 as Exhibit 3 Ptf 186 and Ptf 619-621.

16. In August of 2002, I closed the largest power generation order in Chevron Energy Solutions history, the twin Sunkist Power Projects worth about $30 million in revenue to Chevron over a 10 year period. I got these figures from Defendants' own economic analysis A true and correct copy of said document is attached herein as Exhibit 4 .Ptf 346-350

17. Per Chevron's scheduling, these projects were to be installed and operational by early 2003. A true and correct copy of said document is attached herein as Exhibit 5 . Ptf 595-597).

18. The Sunkist projects in fact did not get installed and become operational until August and September of 2003. A true and correct copy of said document is attached herein as Exhibit 6 . Ptf 718-724 and Ptf 635.

19. On July 14th of 2003, a new Sales Incentive Plan was introduced to the sales team by Puneet Verma, my supervisor and Sales Director. Mr. Verma explained in a conference call with all of his direct reports that the new Incentive Plan [previously faxed to each of the salesmen including myself], was a way for each salesman to make a lot more commission. A true and correct copy of said document is attached herein as Exhibit 7 Ptf 516-524.

20. When I reviewed new Sales Incentive Plan I noted that it specifically said the cap on an individual project would be $250,000. On reading this, I concluded that the Company was being sincere in saying that the new plan was a way for me to make a lot more commission.

21. After receiving the new plan, later that same month Mr. Verma assisted me in computing my commissions under the new incentive plan on my two soon to be completed Sunkist cogen projects. A true and correct copy of said document is attached herein as Exhibit 8 Ptf 337-340.

22. When we calculated the payout to total approximately $390,000 Mr. Verma did NOT comment that the sum appeared in any way too high, unreasonable or inaccurate. In fact, Mr. Verma commented that the numbers looked good.

23. At the time I was aware that Mr. Verma too would be receiving substantially higher bonuses under the new Incentive Plan. In other words, on my $29 million Sunkist projects, Mr. Verma would be getting a significant bonus.

24. The Sunkist projects were specially computed for a 'lump-sum' payout, as Mr. Verma told me that Jim Davis (Chevron Energy Solutions' President), contrary to the terms of the new incentive plan, did not want to extend my commission payments over the 10 years of revenue service for each of the two Sunkist projects.

25. I understood how the Incentive Plan worked and how the Company calculated and paid me a commission based on the Company's payout on another of my projects/sales, specifically, the Spa Casino project.

26. On Spa Casino, Chevron e-mailed me the payout calculations for commissions on the project. I noted that Chevron calculated my commission in comport with Chevron's formula set forth in the Company's new July 2003 Incentive Plan. A true and correct copy of documents related to the Spa Casino project calculation and payout are attached herein as Exhibit 9 PTF 502.

27. In September 2003 I received a payout on the Spa Casino project. I received only a partial payment and to date Defendants have never paid the remaining balance due. A true and correct copy of said document is attached herein as Exhibit 10 PTF 256.

28. The July 2003 Incentive Plan did NOT differentiate or say in any way whatsoever that there would be different wage calculation methods based on project size. In fact, the only limitation I saw in the Plan was the $250,000 cap on each project, as mentioned above.

29. During a September 8th, 2003 Sales Team conference call, Mr. Jacobs stated that Mr. Davis had decided to send my Sunkist commission issue to the newly formed Incentive Committee to rule on my Sunkist commission payout issue on September 10th, as I had been outspoken about Mr. Davis' latest position that I had already been my paid commissions prematurely for my Sunkist projects in 2002. Jim Davis was the head of the newly formed Incentive Committee and everyone on the incentive committee reported directly to Mr. Davis. A true and correct copy of said documents related to these facts is attached herein as Exhibit 11 Ptf 266.

30. I immediately sent my supervisor an email with my concerns as the issue headed to the Incentive Committee for resolution that Wednesday. I also stated that I was considering

taking the matter up officially through the Corporate STEPS dispute resolution process. A true and correct copy of said document is attached herein as Exhibit 12 Ptf 333-335.

31. After hearing nothing from the Incentive Committee in the weeks following their supposed meeting on September 10th, 2003, to decide the Sunkist issue, I wrote to P. Verma that I would need to take my claims to the internal Chevron STEPS grievance process. in order to get resolution. A true and correct copy of said document is attached herein as Exhibit 13 Ptf 504

32. Prior to the Company terminating my employment, no one ever communicated to me, nor did I have any knowledge, that the Company intended to lay off or terminate employees in my division.

33. Prior to the Company terminating my employment, no once communicated to me in any fashion whatsoever that the Company was intending to get out of or divest itself of BOO projects.

34. These representations were made at various times, including in September 2003, at a sales meeting at Overlandpark, Kansas. The sales meeting was called by the new Chief Operating Officer, John Mahoney. At the meeting, Chevron specifically broadcasted the positive aspects of continuing its BOO projects line of business.

35. Prior to the Company terminating my employment, at no time had any Company official or management expressed to me in any way whatsoever that I was in danger of being terminated or laid off. When Puneet Verma called my home to fire me such was a complete shock and surprise.

36. On September 9th, 2003, it was announced that my SR. VP, Jeffrey Jacobs, was being transferred to another Chevron business.

37. However, before Mr. Jacobs transferred, Mr. Verma called me on the morning of September 26th, 2003 to say that Mr. Jacobs needed to talk to me that afternoon to resolve my Sunkist commissions claim to ensure the matter was not sent to the corporate STEPS process. I agreed to the call. See Exhibit 14 ptf 322-323.

38. Mr. Jacobs' called me that same afternoon. He told me that he was sent by Mr. Davis [CES President] to settle the matter with me and said that if I had ever believed that Mr.

Davis would pay me $390,000 (the incentive amount Mr. Verma and I calculated for Sunkist projects per the new incentive plan in July of 2003) that I was "crazy." He said that he had discussed the matter at length with Mr. Davis and that Chevron's proposal was to pay me approximately $110,000 (almost $300,000 less than the new IC plan called for as computed by Mr. Verma and I in July of 2003).

39. The arrangement Mr. Jacobs proposed for speedy internal approval was: 1.) Leave $20 million in project revenue out of the revenue calculation; 2.) Net Present Value the 10 year revenue for a lump-sum payment to me using a 2% discount rate; 3.) Use a plugged 25% value for Margin on both projects even though the latest project economic numbers showed 27% and 32% returns respectively; 4.) Allow for a minimal hold-back to help Mr. Davis 'save face' with regard to his assertion that I was prematurely paid for Sunkist in 2002; and 5.) I would be paid this amount by the end of the year.

40. I reluctantly agreed to Mr. Jacobs' settlement offer to prevent further jeopardizing my career and protect my $107 million in pending contract closings (within the next 6 months). I even continued in good faith to use this vastly less attractive calculation methodology later within my 1st STEPS claim, during my later discussions with HR after I had filed my formal STEPS claim for wages and as I continued to diplomatically strive for a win-win settlement of the issue. See Exhibit 15 Ptf 505-524; See Exhibit 16 Ptf 1-6.

41. Mr. Jacobs said that he would close-out this matter with Mr. Davis before Mr. Jacobs' transfer at the end of September 2003 and would get back to me no later than the 1st week in October to confirm that the deal was in fact acceptable to Mr. Davis.

42. On September 12th, 2003, Mr. Verma emailed me my commission payout calculations template for another recently closed design-build power project I had sold to the Spa Casino in Palm Springs, CA. A true and correct copy of said document is attached herein as Exhibit 17 Ptf 502.

43. This was the only design-build project sold by our entire sales team in 2003. The template appeared to comply with the new incentive plan terms and the initial payout projection of $2,465 called for by the new IC Plan was to be paid to me along with my regular pay.

44. In reviewing the actual check amount, I found that this 1st payment (of 75% of the earned amount) from Chevron for the Spa Casino project was actually several hundred dollars short of the template calculation provided to me by Chevron. A true and correct copy of said document is attached herein as Exhibit 18 Ptf 256.

45. The Company at the time of my firing still owed me the residual 25% of the full payout, per the provided template. Chevron has never paid me the final payment for this project or provided me with any status information on the due payment.

46. After hearing nothing back from Mr. Jacobs, I continued to pursue my Sunkist commission issue and on October 14th, 2003, I sent Mr. Verma an email stating that I was convinced that nothing was happening to resolve the issue. I also stated that I would give Chevron a few more days to resolve the issue prior to me moving my claim to the Facilitator Request stage of the STEPS process by filing a formal corporate complaint. A true and correct copy of said document is attached herein as Exhibit 19 Ptf 12.

47. Although I was extremely worried about retaliation from filing the formal complaint, the corporate policy on STEPS included assurances that I would be protected from retaliation from my management A true and correct copy of said document is attached herein as Exhibit ___ Ptf 389-394 and 626-634.

48. Mr. Verma responded to this email (and said that he didn't see why I would need to file a claim as the Incentive Committee had ruled (which was news to me) that <u>my Sunkist deals were to be paid to me when the projects became operational</u>. A true and correct copy of said document is attached herein as Exhibit 20 Exhibit 21 Ptf 11.

49. On October 14, 2003, I immediately called Mr. Verma upon receiving his email and told him that I objected to several of the assumptions being used by the Incentive Committee for calculating my Sunkist incentive compensation per his email (specifically the project completion dates he stated and the vagueness of the payout holdback amount for 2002).

50. Mr. Verma told me in that same phone call that the Incentive Committee was planning to further discount my NPV with a 10% discount factor. I told Mr. Verma that I now needed to have a set of non-biased eyes via the STEPS process help facilitate this matter.

Declaration – Ptf. Maez in Opposition to Summary Judgment – *Maez v. ChevronTexaco, et al.* **C-04-00790 JSW (EDL)**

- 8 -

51. That weekend, on Saturday October 18th, 2003, Mr. Verma called me to warn me that I didn't want to do anything to bring management attention to myself, **as he had just heard from top management that they may react by terminating me**.

52. Despite Mr. Verma's threat, I filed my a STEPS claim on October 22nd, 2003. Mr. Verma and I never again discussed in any way my owed Sunkist or Spa Casino project commissions subsequent to my filing of this claim. A true and correct copy of said document is attached herein as Exhibit 22 Ptf 505-524.

53. After filing my STEPS claim I continued to contact Barbara Erickson (a Chevron HR representative) to find out the status of my STEPS claim and to see if a facilitator had yet been assigned per the STEPS process guidelines. A true and correct copy of said document is attached herein as Exhibit 23 Ptf 1-6, Ptf 42 and Ptf 57.

54. I never got a substantive answer from her that the STEPS process was either moving forward or that a facilitator was to be assigned. In retrospect, I learned from Chevron Corporate STEPS leader, Kathy Wells-Gallagher (in a telephone call she made to me on 11/19/03 after filing my 2nd STEPS claim for wrongful termination) that my 1st STEPS was never received by corporate HR from Chevron Energy Solutions.

55. At Ms. Wells-Gallagher's request, I emailed her my 1st STEPS claim. Since corporate HR had not received my 1st STEPS claim from Chevron Energy Solutions management until after my firing, a facilitator was not assigned to ever resolve the matter. A true and correct copy of said document is attached herein as Exhibit 24 Ptf 10-13.

56. On November 18th, 2003, several weeks after filing my a STEPS claim, Mr. Verma called to tell me that I was fired. I replied, "Why me? I'm your top producer!" Mr. Verma replied that the decision was made by top-management, not by him, and that he disagreed with the decision. I noted his demeanor appeared to be apologetic. In fact, he specifically said words to the effect that "I was not consulted about your termination. I am sorry, but it is out of my hands, it was a decision made by management. I am just as surprised as you are." He would not elaborate further on the reasons for my termination.

57. I filed my 2nd STEPS claim for Wrongful Termination that same day. Mr. Verma also immediately sent me the Company termination packet via email. A true and correct copy of said document is attached herein as Exhibit 25 Ptf 63-94.

58. Neither Mr. Verma, nor anyone else from Chevron, has ever told me that Chevron was exiting the BOO business. Had I been aware of this, I would have never sent an email to John Mahoney (COO) on December 2nd, 2003, after my firing, asking him to follow-up with my former Customers. A true and correct copy of said document is attached herein as Exhibit 26 Ptf 21.

59. Around September 8, 2003, Jeffrey Jacobs in a conference call to all salesmen berated me in front of everyone and criticized my efforts to resolve the Sunkist project payout.

60. I received a Release Waiver Agreement from Chevron with my final paycheck on December 9th, 2003. On reading the Release Agreement, I noted that by signing the release I would have waived all of my rights on my two current claims (for wages and wrongful termination) in exchange for $18,000 in much needed severance pay. I did not sign the waiver, so I did not receive any severance pay. A true and correct copy of said document is attached herein as Exhibit 27 Ptf 480-483.

61. At the time of my firing I was the top salesman in the group, from a closed and pending contract revenue perspective, considered a 'key' employee per my recent LTIP award and rated as 'exceptional' on my latest performance evaluation A true and correct copy of said documents are attached herein as Exhibit 28 Ptf 355-357, Ptf 591-593, Ptf 598, Ptf 140-141, Ptf 538-539 and Ptf 429-444.

62. If Chevron had legitimate plans on exiting the BOO business, I would have reasonably expected to be notified of these plans some point while still working for the Company.

63. I would have also expected to be told to now only focus on my design-build project sales opportunities, as I was the top sales closer of those type sales as well in 2003 (Spa Casino), and maintained the largest design-build opportunity pending in my sales funnel (Hopland

1  Casino), as presented to my COO in September of 2003 at the Sales meeting in Overland Park,
2  KS. A true and correct copy of said document is attached herein as Exhibit 29 Ptf 461.

3      64. After I was terminated, Chevron continued to call on my accounts, specifically Kraft
4  Foods, a prospective BOO project customer. A true and correct copy of said document is
5  attached herein as Exhibit 30 Ptf 744.

6      65. After I was terminated, I learned that Larry Baebler, one of my former associates,
7  that the Company was still offering BOO cogen at a Trade Conference. A true and correct copy
8  of said document is attached herein as Exhibit 31 Ptf 700-711.

9      66. I was recently made aware that in 2004, after I had been terminated, Chevron had
10 entered into a BOO contract with the US Army. A true and correct copy of said document is
11 attached herein as Exhibit 32.

12     67. As instructed by Mr. Verma and the Termination email packet he emailed me at my
13 firing, I immediately filled out and faxed Mr. Verma and HR my redeployment form to be
14 considered for reassignment to another job within the company   I never heard back from Mr.
15 Verma or HR on the subject. A true and correct copy of said document is attached herein as
16 Exhibit 33 Ptf 465-466; Ptf 63-64; Ptf 65-94.

17     68. Contrary to my termination package, Mr. Verma went on to tell a reference checking
18 firm on January 5th, 2004 that I was in fact not eligible for rehire at Chevron. In that same
19 reference, Mr. Verma went on to cast doubts upon my suitability for employment. A true and
20 correct copy of said document is attached herein as Exhibit 34 Ptf 48-49.

21     69. After I was terminated, Chevron continued to advertise for my vacated position and
22 during 2004, Chevron posted numerous sales positions that I was fully capable and qualified to
23 fill. A true and correct copy of said document is attached herein as Exhibit 35 Ptf 418-426; Ptf
24 585-588).

25     70. I have only spoken with Mr. Verma twice after my firing; the morning following my
26 firing I called him to reschedule my exit interview scheduled for that afternoon, and on February
27 3rd, 2004, he called my home to say he was sending me my final corporate credit card bill. We
28 discussed nothing but those two subjects on those calls.

71. Two weeks after my firing and my 2nd STEPS claim filing for Wrongful Termination, I finally received a phone call and email from Donald Khroviak, a STEPS facilitator assigned to my 2nd STEPS claim. He had contacted me to set-up a facilitation in late December (with Mr. Jacobs assigned as the company representative). I declined as I felt Chevron dragged their feet on the matter by setting-up the facilitation only AFTER they were sure that I would no longer be on payroll (I went off of payroll on December 10th, 2003), and as a non-employee, my job could no longer be saved through their corporate dispute resolution process. Chevron had over a 21 day window after my firing that would still have allowed me to be remain on payroll during the facilitation process. Besides, I had just been through a settlement negotiation with Mr. Jacobs 2 months prior (to supposedly settle my Sunkist wage claim) that turns out to have ended disastrously. A true and correct copy of said document is attached herein as Exhibit **36** Ptf 95-102; Ptf 25-26.

72. No one from Chevron has during or after my firing (until after my filing of a Federal complaint), mentioned or discussed with me my owed Sunkist or Spa Casino commissions, or offered to resolve the issue with me in any way.

73. Not until May and June of 2004 (6 months after my firing, and 2 months after my filing a Federal complaint), did I receive emails from Mr. Verma, promising a deeply discounted $16,965 as commission for my $29 million Sunkist sales. A true and correct copy of said document is attached herein as Exhibit **37** ptf 448; Ptf 449-450)

74. Prior to Mr. Verma's contact in May 2004, I was never made aware by anyone at Chevron that Chevron intended to pay me anything for my Sunkist contracts.

75. Although the Chevron promised to pay the $16,965 in June 2004, the check never arrived. I finally received the check in September of 2004(one year after the Sunkist projects were completed, and 10 months after my firing). A true and correct copy of said document is attached herein as Exhibit **38** Ptf 654-657.

76. The calculations in Mr. Verma's final commission payout spreadsheet were grossly different from the post project completion economic models Chevron had prepared in October of 2003, the original payout calculations Mr. Verma and I had completed in July of 2003 per the

1  new IC plan guidelines, and the payout calculation methodology and values I had conceded to (to
2  settle the issue) with Mr. Jacobs in September of 2003. A true and correct copy of said
3  document is attached herein as Exhibit 39. Ptf 346-350; Ptf 337-340.

4      77. Chevron has never offered an explanation of this substantial discrepancy for the
5  latest calculation of Sunkist project economic numbers or the incentive payment. Chevron has to
6  date made no attempt to communicate with me regarding my still owed Spa Casino commissions
7  despite the fact that it was again brought to Chevron's attention in my September 2004
8  deposition.

9      78. In compliance with my Rule 26 disclosure obligations, I have provided Defendants
10 approximately 750 pages of material in my possession.

11     79. After I was terminated from employment I found out that based on the Agreements I
12 signed and the dealings I had with Chevron, I needed to find a California attorney to handle my
13 case. I was dismayed to hear that I needed to retain counsel in another state since such would be
14 expensive and stressful.

15     80. When I commenced working for Chevron, the Company required I sign a
16 confidentiality agreement. After some discussion with the Company's lawyers [Doug Oglesby],
17 I signed the Agreement. A true and correct copy of the Confidentiality Agreement is attached
18 herein as Exhibit 40.

19     81. Before the attached communication from Puneet Verma in May 2004, at no time did
20 anyone from Chevron contact me to say that Chevron intended to pay me wages, commissions or
21 incentive pay.

22     82. At the time I was terminated, in December 2003, Chevron sent me a Release of All
23 Claims to sign. Chevron informed me that to receive three month's severance pay, I had to sign
24 the Release of All Claims. A true and correct copy of the Release of All Claims Chevron gave
25 me is attached herein as Exhibit 41.

26     83. At no time did anyone from Chevron ever tell me that in signing the Release, that I
27 would still be receiving further wages at some later time. In fact, as I understood the Release, if I
28 signed it, I would be giving up all rights to pursue any claims against Chevron, including claims

Declaration – Ptf. Maez in Opposition to Summary Judgment – *Maez v. ChevronTexaco, et al.* C-04-00790 JSW (EDL)

1 for wages. I gained this understanding by looking at clauses in the Release that specifically said on signing the document I could never pursue any claims against ChevronTexaco or any its subsidiaries and divisions.

84. I also noted in the Release that in signing it I would be giving up my right to pursue even unknown claims, this pursuant to a California code section mentioned in the Release. I understood this to mean that similar to the confidentiality agreement I signed, in any dispute Chevron wanted California law to apply.

85. I have seen in Defendant's summary judgment papers that they are now characterizing my employment termination as a "layoff." As a layperson and regular employee, to me "layoff" means that there may be a possibility that Chevron would rehire me or find me another position within the Company.

86. At the time Chevron terminated my employment and beyond, absolutely no one from Chevron or elsewhere ever characterized or said that my termination from Chevron was a "layoff."

87. In October 2003 Puneet Verma warned me that I should be careful and tread lightly about demanding payment of wages. I knew what Puneet was referring to was my continued requests to the Company that we calculate how much I will be receiving in incentive wages on my $29 million Sunkist sale.

88. At no time, from the time Puneet Verma called to fire me, did anyone at Chevron tell me that the Company needed to determine costs projections or other factors so to calculate how much incentive compensation I would receive.

89. From July 2003 up until the time the Company fired me, I believed that under the July Incentive Plan, commissions on my Sunkist sales were payable to me at some time between July through November 2003, but not at some point in 2004. In fact, during the time I was calculating the incentive wages due me, and while talking to Puneet Verma and Jeffrey Jacobs, no one ever told me in any way whatsoever, that a payment could not be determined or that the payment due would not be paid until 2004.

90. In March 2004 I received at my home address a check from Chevron in the amount of $249. A true and correct image/copy of said check is attached herein as Exhibit ___. A true and correct/image copy of then Chevron mailing envelope is attached herein as Exhibit ___

91. Chevron mailed and e-mailed me profit and cost calculations on my $29 million "Sunkist" sale to show how they arrived at the approximately $17,000 they said was owed to me.

92. In early June 2004, I received a letter from Chevron Human Resources talking about my STEPS internal grievances that I had filed while still an employee of Chevron. HR also said they heard I had been paid my wages. In fact, Chevron did NOT send me the approximately $17,000 in wages they promised to pay.

93. At my deposition in September 2004, Chevron's lawyers asked if I had received the wages in June 2004. I testified "no." In late September 2004, I received a pay check totaling approximately $17,000, which Chevron said was the amount I was owed. They did not address the fact that on the Sunkist sale I am alleging Chevron owes me about $400,000 in wages [including interest].

94. Since I was terminated from Defendants' employ, I have maintained the same mailing and residential addresses. I have never avoided receipt of mail, nor refused to accept payments or mail from Defendants.

/ / /

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct. Signed at __PHOENIX, AZ__, on June 3, 2005.

_____
LANDIS MAEZ