IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANDIS MAEZ,<br><br>   Plaintiff,<br><br> v.<br><br>CHEVRON TEXACO CORP., CHEVRON U.S.A. INC., CHEVRON ENERGY SOLUTIONS L.P.,<br><br>   Defendants.<br>_____/ | No. C 04-00790 JSW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

   This action came on for a bench trial which began on October 11, 2005 and lasted three court days. Plaintiff Landis Maez ("Plaintiff") appeared by his counsel, Michael Mortimer, and Defendants Chevron Corporation, Chevron U.S. A. Inc. and Chevron Energy Solutions, L.P. (collectively, "Chevron") appeared by their counsel, M.D. Moyle. The Court, having considered the trial testimony and exhibits admitted into evidence, as well as the arguments of counsel, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

   Plaintiff, a former Chevron sales employee, argues that: (1) he was owed wages when he was terminated under the company's incentive compensation plans; (2) Chevron terminated Plaintiff's employment for filing grievances in breach of Chevron's agreement not to retaliate; (3) Chevron prematurely withdrew Plaintiff's stock options under the Long Term Incentive Plan; and (4) Chevron owed him $17,000 in severance pay.[1]

---

[1] Plaintiff brought the following claims under California law: (1) nonpayment of wages in violation of "California Industrial Wage Orders;" (2) waiting-time penalties under California Labor Code for failure to pay wages when due; (3) breach of contract for

# FINDINGS OF FACT

Plaintiff was employed by Chevron. Plaintiff did not reside in California or maintain a physical office in California at any time during his employment by Chevron. (Joint Stipulation ("Joint Stip."), Nos. 2, 3.) Plaintiff's employment was terminated by Chevron on December 10, 2003 by a notice Plaintiff received on November 18, 2003. (*Id.*, No. 7.) Plaintiff alleges that when he was terminated, he was owed wages from commissions he earned from the Spa Casino project and two "build-own-operate" ("BOO") Sunkist projects.[2]

## A. 2002 Short Term Incentive Plan.

In 2002, Plaintiff was covered by Chevron's 2002 Short Term Incentive Plan. (*Id.*, No. 16.) In 2002, the Sunkist projects had not yet been completed and Chevron had not yet received any revenue for the them. (*Id.*, No. 11.) Chevron paid Plaintiff $48,614 in bonus compensation under the 2002 Short Term Incentive Plan for the year 2002. (*Id.*, No. 12.) Plaintiff does not contend that he was owed any compensation under the 2002 Short Term Incentive Plan for any projects completed in 2002.

Plaintiff argues that his projects in the first half of 2003 were covered by the 2002 Short Term Incentive Plan because the 2003 Incentive Plan was not implemented until July 2003. (Transcript, 315:24-316:9.) The 2002 Short Term Incentive Plan provides that it is "[e]ffective January 1, 2002 through December 31, 2002." (Ex. 52.) Plaintiff testified that was never told

---

terminating him in retaliation for filing grievances; and (4) wrongful termination in violation of public policy. Chevron argued that Plaintiff was not a California employee, and thus, was not subject to the protection of California law. In Plaintiff's brief entitled "Plaintiff's Closing Argument and Opposition to Defendants' Motion for Judgment as a Matter of Law" ("Plaintiff's Br."), Plaintiff concedes that Arizona law, rather than California law should be applied. Plaintiff thus contends that he is bringing claims under Arizona law. Plaintiff further concedes that under Arizona law, he cannot bring a claim for wrongful termination in violation of public policy. Chevron does not argue that it would be prejudiced by Plaintiff's purported amendments to his complaint to assert claims under Arizona law at this late stage. Therefore, the Court will consider whether Plaintiff has proven any claims under Arizona law for unpaid wages or breach of contract.

[2] Chevron Energy Solutions offered two types of projects: design-build and build-own-operate. In design-build projects, Chevron would design and install the cogeneration system and then sell the system to the customer. (Transcript, 12:19-24, 31:4-14.) In build-own-operate projects, Chevron would purchase and install the equipment, maintain ownership over the system, and then sell the energy produced by the system to the customer. (Transcript, 12:25-13:4, 31:15-18.)

2

that the 2002 Short Term Incentive Plan was extended to cover projects completed in 2003. (Transcript, 316:17 – 317:4.) Plaintiff did not present any evidence of specific projects in 2003 that were covered by the 2002 Short Term Incentive Plan or evidence as to what damages he alleges he incurred under this plan. With respect to the Spa Casino project, the parties specifically stipulated that Plaintiff earned compensation under the 2003 Incentive Plan. (Joint Stip., No. 17.)

**B.  2003 Incentive Plan and Payments.**

The 2003 Incentive Plan provides that:

> For Booked Projects, seventy-five percent (75%) of the incentive based on the Projected Gross Margin will be paid out once Chevron ES has received at least 20% of the total sales price in cash. The balance of the incentive based on Final Gross Margin will be paid after project closeout. A Scorecard Factor based on the 2003 year-end Chevron ES Scorecard results will be paid out quarterly with a 0.9 Scorecard Factor. If at year-end we have met or exceeded the Scorecard Goal, the proper adjustments will be made at that time.
> This incentive plan will be applied to projects booked on or after January 1, 2003 through December 31, 2003... .
>
> **Rules of the Road:**
>
> 1. No project will be "booked" and counted toward incentive without a fully executed contract, completed cover sheet ... and the receipt of at least 20% of the total sales price in cash. Projects must be funded/financed for incentive to be paid. Chevron ES reserves the right to withhold incentive until payment is made, as well as adjust incentive for cost of money.
>
> 2. Incentive will be paid based on Projected Gross Margin once at least 20% of the Booked Revenue is collected in cash. The balance of incentive adjusted for Final Gross Margin will be paid at project close out. Payment will be made as follows:
>    • 75% paid once at least 20% of Booked Revenue has been received by Chevron ES
>    • 25% paid after Project Close-Out, adjusted for Final Gross Margin
>
> 3. Incentive will be paid quarterly approximately 8 weeks after the financial close of the fiscal quarter in which the above referenced payment is received or the project is completed.
>
> ...
>
> 9. Matters such as disputes or challenges to the program or requests for non-standard treatment, shall be directed to the Incentives Committee for resolution. All decisions by the Incentives Committee shall be final.
>
> ...
>
> 12. .... Incentive will be paid out quarterly with a 0.9 Scorecard Factor. If at year-end we have met or exceeded the Scorecard Goal, the proper adjustments will be made at that time.

(Ex. 206.)

3

By the time Chevron gave Plaintiff the 2003 Incentive Plan, the Sunkist projects had not yet been implemented or become operational. (Joint Stip., No. 4.) Chevron calculated any compensation owed to Plaintiff under the Sunkist projects pursuant to the 2003 Incentive Plan. (*Id.*, No. 18.)

Plaintiff contends that the total sales price for the two Sunkist Projects was $28.5 million, and thus, that 20 percent of this amount would have been close to six million. (Transcript, 334:16-21.) Plaintiff conceded that Chevron has not yet received the threshold 20 percent of the total sales price from these projects. (*Id.*, 334:22-25.) In fact, Plaintiff testified that Chevron had received only a couple of hundred thousand dollars by the date Plaintiff was terminated on December 10, 2003. (*Id.*, 291:1-8.) Plaintiff further conceded that pursuant to the written terms of the 2003 Incentive Plan, Plaintiff is not due any compensation for the Sunkist projects. (*Id.*, 335:1-2.) Plaintiff also testified that he would not be eligible to receive compensation for revenue Chevron received after his employment terminated. (*Id.*, 97:2-22.)

The 2003 Incentive Plan provides that any disputes or challenges to the amount of incentive payments "or requests for non-standard treatment, shall be directed to the Incentives Committee for resolution." (Ex. 206). The Plan further provides that "[a]ll decisions by the Incentives Committee shall be final." (*Id.*) With respect to the Sunkist projects, the Incentives Committee decided it would pay Plaintiff a total of $40,157. The Incentives Committee further found that Plaintiff had been paid $23,192 for the Sunkist Projects as part of his 2002 STIP, and thus was owed only $16,965. (Exs. 29, 257; Transcript, 420:12-24.) Plaintiff received a check for $16,965 from Chevron in September 2004. (Transcript 150:6-8.)

Chevron initially calculated that 75 percent of the incentive payment for the Spa Casino project was $2465. (Ex. 207; Transcript, 584:10-12.) At the time Chevron made this calculation, Chevron estimated that the margin for this project would be 13 percent, which is less than the required percent under the 2003 Incentive Plan. (Ex. 207.) The Incentives Committee made an exception for this project to pay Plaintiff 75 percent of the incentive

4

payment multiplied by the 0.9 scorecard factor. (Transcript, 582:11-21.)[3] In September 2003, Chevron paid Plaintiff $2,218.56 for the Spa Casino project. (Joint Stip., No. 5.) In March 2004, Chevron paid Plaintiff $245.51, which equals the remaining 10 percent of the first 75 percent of the projected commission for the Spa Casino project. (*Id.*, No. 6.) When the Spa Casino project was completed and all of the costs were considered, the margin on the project was 14.1 percent. (Transcript, 286:6-9.)

**C.    Severance Pay.**

When Plaintiff was terminated, Chevron offered Plaintiff a severance payment of $17,000 for executing a release of claims. Plaintiff did not execute the release. Chevron did not pay Plaintiff the $17,000 severance pay. (Joint Stip., No. 20.)

**D.    Stock Options.**

Plaintiff received stock options under Chevron's Long Term Incentive Plan ("LTIP") in 2001, 2002, and 2003. (Joint Stip., No. 22; Exs. 62, 76, 98.) Chevron granted Plaintiff 1000 stock options on October 31, 2001, all of which were vested by the time Plaintiff was terminated on December 10, 2003. (Ex. 98.) On June 26, 2002, Chevron granted Plaintiff 1000 options, one-third of which had vested by the time Plaintiff was terminated. (Exs. 62, 98.) On June 25, 2003, Plaintiff was granted 1,200 stock options, but none of these had vested by the time he was terminated. (Ex. 76.) Plaintiff did not exercise any vested options on or before March 10, 2004. (Joint Stip., No. 23.) When Plaintiff checked the status of his stock options in April 2004, he observed that he no longer had any options remaining. (Transcript, 325:15-23.)

The Long Term Incentive Plan provides:

---

[3] Plaintiff argued that "[i]n September 2003, the Incentive Committee ruled that all [commercial and industrial facility] projects with more than 10% margin would qualify for 2003 Incentive Compensation." (Plaintiff's Br. at 14.) For support, Plaintiff points to his testimony that at a sales meeting in mid-September 2003, the new Chief Operating Officer of Chevron Energy Solutions, John Mahoney, told him that "because [commercial and industrial facility] projects are not as lucrative as some of the demand side promise (sic), there was a blanket dispensation for [commercial and industrial facilities]. Anything over 10 percent qualified for margin reimbursement, and that was reflected in my Spa Casino template. (Transcript, 153:14-19.) The Court finds Plaintiff's testimony that the Incentives Committee agreed to a blanket exception to provide incentive compensation for all projects with a margin of at least 10 percent to not be credible.

5

> Upon Termination of employment for reasons other than (a) death, (b) Disability, or (c) termination of employment (i) at or after age 50 and upon completing ten Years of Service, (ii) at age 65 pursuant to the Corporation's mandatory retirement policy or (iii) following a Change in Control under circumstances which cause the Optionee to become eligible for severance pay under the applicable executive severance programs maintained by the Corporation, vested Stock Options may be exercised within 90 days from the date of terminate (but in no case later than ten years from the date of grant.)

(Ex. 12.) Jeffrey Morris Jacobs, the Senior Vice-President of Chevron Energy Solutions, testified that there is information relating to stock options on Chevron's website indicating that if a former employee fails to exercise his or her stock options with 90 days of termination, the stock options are lost. (Transcript, 565:19-566:6.)

Other than the stipulation that Plaintiff did not exercise any of his Chevron stock options on or before March 10, 2004, Plaintiff did not submit any evidence indicating his history of exercising stock options. Nor did Plaintiff present any evidence demonstrating: (1) when he would have exercised these options, (2) what the value of the stocks were at that time, or (3) what the exercise prices were for his vested options.

**E.     Grievances.**

Plaintiff filed formal grievances under Chevron's STEPS program on October 22, 2003 and November 18, 2003. (Joint Stip. No. 24.) The STEPS program provides, among other things, that an employee filing a grievance will not be subject to retaliation. (Joint Stip. No. 25.)

Chevron presented credible evidence demonstrating it terminated Plaintiff as part of a layoff, rather than in retaliation for any grievance he filled. Chevron acquired Viron in 2003. As result of the acquisition, Chevron conducted a reorganization and eliminated certain positions. (Transcript, 238:3-240:20.) Chevron decided that it would shift its focus from commercial and industrial facilities to Viron's focus on public sector projects. (*Id*., 357:19-359:5.) In line with this shift in focus, Chevron was no longer going to provide capital to invest in on-site generation projects. (*Id*., 359:6-13.) In light of the fact that the company did not have the resources or the interest to proceed with on-site generation projects, also referred to as BOO projects, and that Plaintiff had primarily focused on BOO projects, Plaintiff's direct supervisor, Puneet Verma, ranked Plaintiff last out of five sales employees. (*Id*., 465:14-

466:25.) In November 2003, Chevron laid off Plaintiff as part of its reorganization. (Exs. 213, 222; Transcript, 360:18-23, 363:3-10.)

## CONCLUSIONS OF LAW

Plaintiff failed to demonstrate under Arizona law that Chevron owes Plaintiff additional incentive payments either under the 2002 Short Term Incentive Plan or the 2002 Incentive Plan, or that Chevron unlawfully delayed paying Plaintiff wages he was owed when his employment was terminated.

**A.     2002 Short Term Incentive Plan.**

Although Plaintiff argues that the 2002 Short Term Incentive Plan applied to his projects in the first half of 2003, the 2002 Short Term Incentive Plan ended on December 31, 2002. (Ex. 52.) Plaintiff did not present any evidence demonstrating that Chevron extended the 2002 Short Term Incentive Plan into 2003. Accordingly, the Court concludes that Plaintiff failed to demonstrate that Chevron owed Plaintiff additional compensation under the 2002 Short Term Incentive Plan.

Moreover, even if the Court could find that Plaintiff demonstrated the 2002 Short Term Incentive Plan extended to cover projects in the first half of 2003, Plaintiff failed to present any evidence from which the Court could determine what damages, if any, were incurred. *See Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (Ariz. 1975) (plaintiff bears burden of proving damages). The Court thus finds in favor of Chevron and against Plaintiff as to Plaintiff's claims for additional compensation under the 2002 Short Term Incentive Plan.

**B.     2003 Incentive Plan.**

Plaintiff argues that Chevron failed to pay him the full amount of incentive compensation for the Sunkist projects and the Spa Casino project. The 2003 Incentive Plan provides that Chevron is not obligated to pay any incentive payments unless the margin on the project is at least 25 percent and until Chevron receives at least 20 percent of the sales price. (Ex. 206). If there is any dispute or challenge to the incentive payment or if an employee requests non-standard treatment, the Incentives Committee has the ultimate authority to resolve such issues. (*Id*.)

The Spa Casino project was never estimated to and did not actually reach the threshold 25 percent margin. (Ex. 207, Transcript, 286:6-9.) Chevron did not receive 20 percent of the sales price on the Sunkist projects when Plaintiff an employee. (Transcript, 291:1-8, 334:22-25.) The evidence demonstrates, and Plaintiff does not contend otherwise, that under the written terms of the 2003 Incentive Plan, Chevron was not obligated to pay Plaintiff any incentive compensation. Although the Incentives Committee made discretionary decisions to pay Plaintiff some compensation for these projects, Plaintiff failed to demonstrated that the Incentives Committee was obligated to pay Plaintiff a certain amount or that Chevron ever entered into a binding agreement to pay Plaintiff an amount other than what was required by the 2003 Incentive Plan.

Moreover, to the extent the Incentives Committee decided to provide Plaintiff some compensation for these projects, Chevron paid Plaintiff such amount. Accordingly, Plaintiff failed to show that he was owed any wages for the Spa Casino or Sunkist projects and thus, did not demonstrate that Chevron breached any agreement to pay Plaintiff compensation. *See Graham*, 112 Ariz. at 185, 540 P.2d at 657 (plaintiff bears burden of proving the existence of the contract and its breach). Accordingly, the Court finds in favor of Chevron and against Plaintiff as to Plaintiff's claims for additional compensation under the 2003 Incentive Plan.

**C.     Breach of Contract: Retaliation.**

With respect to Plaintiff's claim that Chevron terminated him because he complained about he incentive payments in violation of an agreement not to retaliate, the Court concludes that the evidence demonstrates Chevron terminated Plaintiff as part of a layoff and reorganization, not in response to any complaints or grievances Plaintiff filed regarding his wages. Accordingly, the Court finds that Plaintiff failed to demonstrate causation and thus, enters judgment in favor of Chevron on this claim. *See Graham*, 112 Ariz. at 185, 540 P.2d at 657 (plaintiff must prove damages resulting from a breach of contract).

**D.     Severance Pay.**

Plaintiff argues that Chevron owes Plaintiff $17,000 in severance pay. It is undisputed that when Plaintiff was terminated, Chevron offered Plaintiff a severance payment of $17,000

8

for executing a release of claims. However, Plaintiff did not execute the release. (Joint Stip. No. 20.) "To bring an action for breach of the contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." *Graham*, 112 Ariz. at 185, 540 P.2d at 657. Because Plaintiff did not sign the agreement, Plaintiff failed to demonstrate an agreement to pay severance existed. Accordingly, the Court finds for Chevron and against Plaintiff on Plaintiff's claim for severance pay.

**D.     Stock Options.**

Finally, Plaintiff argues Chevron wrongfully terminated his vested stock options. The Long Term Incentive Plan provides that Plaintiff had 90 days from the date of his termination to exercise his vested stock options. (Ex. 12.) Moreover, Mr. Jacobs testified that Chevron's website explained that the failure to exercise vested stock options within 90 days of termination would result in losing the options. It is undisputed that Plaintiff did not exercise his options within the requisite 90 days.

However, even if Plaintiff could have demonstrated that Chevron was not entitled to terminate his vested stock options after 90 days, Plaintiff has not met his burden to provide evidence from which the Court may calculate damages. *See Graham*, 112 Ariz. at 185, 540 P.2d at 657 (plaintiff bears burden of proving damages for breach of contract claim). Plaintiff did not submit any evidence indicating his history of exercising stock options. Nor did Plaintiff present any evidence demonstrating: (1) when he would have exercised these options, (2) what the value of the stocks were at that time, or (3) what the exercise price was for his vested options.

Plaintiff argues that the Court should provide him equitable relief by issuing an injunction requiring Chevron to return the vested stock options. However, where damages would be adequate to provide compensation, the Court may not issue an injunction. *See Cracchiolo v. State*, 135 Ariz. 243, 247, 660 P.2d 494, 498 (Ariz.App.1983). Here, had Plaintiff provided evidence from which damages may have been determined, the Court could have calculated damages. Thus, the Court could have awarded damages adequate to compensate Plaintiff if he had met his burden to present evidence of his damages. Accordingly, the Court

9

finds in favor Chevron and against Plaintiff on his breach of contract claim as to the stock options.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Chevron and against Plaintiff on all claims.

**IT IS SO ORDERED.**



Dated: May 11, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE